UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TONEY T. THIBODEAUX, SR.                    CIVIL ACTION

VERSUS                                       NO: 06-6626

LYTAL MARINE SERVICES,                       SECTION: J(5)
L.L.C. AND LYTAL
ENTERPRISES, INC.

## ORDER AND REASONS

Before the Court is third-party Defendant Master Boat Builders, Inc.'s ("MBB") **Motion for Summary Judgment (Rec. Doc. 52)**, seeking dismissal with prejudice of the complaint of third-party plaintiff and principal defendant Lytal Marine Services, L.L.C. ("Lytal").

## PROCEDURAL HISTORY AND BACKGROUND FACTS

The principal action in this case concerns Plaintiff's claims for personal injuries arising from an alleged slip and fall from a ladder leading down into the rope locker beneath the forward deck of the M/V Lytal Queen, a 159 foot support utility vessel owned by Lytal. Plaintiff was climbing into the rope locker after it had been determined that a salt-water leak into the crew's forward quarters was due to the fact that the rope locker was filled to a depth of 4-5 feet with sea water. During the subsequent operations in the rope locker, it was discovered that the hatch cover to the rope locker was missing certain parts

necessary to form a water-tight seal.  After pumping out most of the water, Plaintiff was descending the ladder into the rope locker in order to pump out the rest, when he slipped and fell on a rung of the ladder, striking his lower back on an angle iron alongside the bulkhead.  Plaintiff, who was working as the captain of the vessel at the time of the accident, asserts personal injury claims under the Jones Act and general maritime law as a result of the accident, including a claim that the M/V Lytal Queen was unseaworthy due to the missing components of the rope locker hatch cover assembly.

Lytal filed a third-party complaint against MBB on, alleging both maritime and diversity jurisdiction.  Lytal's third-party complaint asserts claims for indemnity under a contract to design, manufacture, and build the M/V Lytal Queen ("the Contract"), as well as claims that MBB failed to name Lytal as an additional assured as required by the Contract.  Additionally, Lytal's complaint asserts that any liability against it for Plaintiff's injuries was the result of MBB's own negligence and/or breach of the Contract.  Furthermore, Lytal asserts that, in the event it is found liable for Plaintiff's injuries, MBB is in turn liable to Lytal under Louisiana principles of redhibition as the seller or manufacturer of a defective product. Lytal also asserts indemnity claims against MBB for breach of warranty, as well as alternative claims under Alabama law in the

event Louisiana law is found to be inapplicable.

Lytal's claims against MBB are based on allegations that MBB failed to properly install a single-bolt manhole assembly[1] in the port-side foscle deck of the M/V Lytal Queen.  Specifically, Lytal asserts that MBB failed to install a neoprene gasket ("latch") and mild steel strongback ("crossbar") which were necessary to ensure a watertight seal and proper functionality of the manhole assembly.

MBB's present motion seeks summary dismissal with prejudice of Lytal's claims based on its contention that there is unequivocal evidence that MBB properly installed the manhole assembly.  Lytal opposes the motion and argues that there are material issues of fact precluding summary judgment.  Plaintiff likewise opposes MBB's motion.

## THE PARTIES' ARGUMENTS

MBB relies on two pieces of evidence in support of its motion: (1) the deposition testimony of U.S. Coast Guard Vessel Inspector Mark Wallace, who was assigned to oversee and inspect the new construction of the M/V Lytal Queen; and (2) the deposition and affidavit testimony of Kenneth James Lacoste, an independent vessel inspector hired by Lytal to oversee MBB's construction of the M/V Lytal Queen.

---

[1] This assembly provides access to and watertight coverage of the vessel's rope locker.

MBB asserts that Wallace testified that he examined and inspected the manhole assembly at issue on numerous occasions. Specifically, MBB notes the following deposition questions and responses that support its argument that Wallace unequivocally recalled that the assembly was properly installed:

> Q. Okay. So can you confirm for us that at the time of delivery of the vessel from [MBB to Lytal] . . . was that unibolt manhole cover installed properly by [MBB]?
>
> A. In my opinion, it was.

Rec. Doc. 52-3, Deposition of Mark Wallace, at p. 18. Wallace also described his usual method of testing the proper, functional installation of a single-bolt manhole, and his application of that method on the M/V Lytal Queen:

> Q. [T]ell me how the watertight integrity check is conducted.
>
> A. In the case of watertight or weather-tight doors, its – normally you would . . . make sure that the – you had a good seal . . . . Single-bolt manhole make sure that the bolt is there and if you can see the gasket from the – around the edges of the manhole.
>
> Q. And in the case of a single-bolt manhole cover, can you visually confirm that the gasket is around the lid without actually taking the cover off?
>
> A. It depends on how much paint is on the manhole cover.
>
> Q. Okay. In the case of the M/V LYTAL QUEEN, did you conduct this type of watertight integrity testing.
>
> A. Yes.

4

Id. at p. 21. In addition, Wallace also testified that the assembly was properly installed upon delivery to Lytal from MBB:

> Q. [C]an you confirm that [the manhole assembly] was properly installed and in place on November 18?
>
> A. Yes.

Id. at 22-23. Wallace further testified that on the final, pre-sea trial walk-through of the vessel, he viewed the manhole, and saw that the strongback and gasket were in place. Id. at p.38. When asked if his memory was based on the fact that he simply *would have* checked for these items, or whether he *actually remembered* seeing them on the vessel, Wallace confirmed that he "specifically remember[ed]" seeing the gasket and strongback. Id. at p. 43. In sum, Wallace testified that "when we did the final entry into the rope locker, which would have been before the sea trials, the strongback was there, the gasket was there, and the manhole cover was there." Id. at p. 47.[2] MBB contends that this sworn testimony *unequivocally proves* that MBB properly installed the single-bolt manhole assembly in a watertight manner, and thus dismissal of Lytal's claims is appropriate.

Likewise, MBB cites the testimony of Lacoste, *Lytal's own independent consultant* who oversaw construction of the M/V Lytal

---

[2] For purposes of clarification, and despite the manner in which MBB has excerpted Wallace's testimony, it should be noted that Wallace was equivocal throughout the course of questioning as to whether he *actually inspected* or simply *would have as a matter of course inspected* the gasket and strongback in place prior to the sea-trial.

5

Queen. Specifically, MBB notes the following deposition colloquy in which Lacoste confirmed the proper installation of the manhole assembly by MBB:

> Q. Did you ever perform a visual inspection of the unibolt manhole cover at any time on the M/V LYTAL QUEEN?
>
> A. That would have been part of my inspection. Yes.
>
> * * *
>
> Q. Okay. When you inspected the cover and manhole assembly on the M/V LYTAL QUEEN after its installation and assembly by [MBB], did you specifically note that the strongback or latch . . . was in place?
>
> A. Yes.
>
> Q. Okay. And when you specifically looked at the unibolt manhole assembly after the installation . . . did you specifically see that the watertight gasket was in place?
>
> A. Yes.
>
> Q. Okay. Did it appear to you that the watertight gasket and the latch or strongback were in place and properly fitted by [MBB]?
>
> A. Yes.

Rec. Doc. 52-4, pp. 27-29. Lacoste has also included an unsworn declaration (Rec. Doc. 52-11) in which he confirms that he "specifically noted" during his general presence as a consultant on the M/V Lytal Queen project that MBB properly installed the single-bolt manhole assembly, complete with the gasket and strongback, so that it was completely watertight. MBB contends that this arguably unequivocal evidence, presented by Lytal's own

man on the job, compels summary judgment of Lytal's claims.

In opposition, Lytal argues that there are material issues of fact that preclude summary dismissal of its third-party claims. First, Lytal notes Plaintiff's allegations that the strongback and gasket, which were necessary to properly seal the rope locker, *were not in place* at the time of his injury while descending into the locker. Further, Lytal asserts that between the *delivery* of the vessel and Plaintiff's discovery of the missing pieces, *the rope locker had not been opened or used at all*. Lytal characterizes MBB's motion as based on inconclusive and speculative assertions that the strongback and gasket *must have been* in place after the vessel left its yard. However, Lytal contends that it *remains undisputed* that at the time of Plaintiff's fall, the gasket and strongback were in fact missing.

Lytal specifically argues that the evidence raises questions of fact as to when, if ever, the gasket and strongback were installed, and/or whether they were removed prior to delivery of the vessel by MBB. Lytal notes Plaintiff's deposition testimony that when he applied a wrench to the hatch cover in the process of opening it to investigate salt water intrusion into the rope locker, he discovered that the cover was not tightened down and that the nut designed to hold it in place spun freely. See Rec. Doc. 56-2, at pp. 40-42. Further, Lytal contends that there is undisputed evidence that the rope locker was never used for any

7

purpose, and thus it had never been opened, prior to Plaintiff's entry. Further, Lytal argues that after removing the nut, Plaintiff pried open the hatch cover and discovered that the gasket and strongback were missing. Id. Lytal argues that this is significant because, despite the absence of a gasket and strongback that would have sealed the manhole, the cover still had to be pried open, suggesting that the manhole cover had simply been painted shut and never opened until Plaintiff entered the rope locker. Plaintiff further testified that the crew never removed, nor would have had reason to remove, the gasket and strongback because the rope locker was never used. Rec. Doc. 56-3, at 58-60 & 62.[3] Plaintiff further noted that the absence of those components would not have been discovered during sea-trials because the placement of the nut suggested - without testing its snugness - that the gasket and strongback were in place. Rec. Doc. 56-2, at 52.

Additionally, Lytal notes that Lacoste's testimony, relied on so heavily by MBB, actually reveals a material issue of fact regarding the issue of whether the manhole assembly cover was painted over. As an initial matter, Lytal notes that Lacoste was

---

[3] Lytal also presents the unsworn declaration of Brian Larousse, relief captain for the M/V Lytal Queen who was on board from delivery of the vessel to the time of the accident, that the rope locker was never opened or used for storage, and that no crew or personnel ever removed the gasket or strongback. Rec. Doc. 56-6.

8

unable to recall without referencing documents whether he oversaw the construction of the M/V Lytal Queen, likely because he was overseeing construction of several different vessels for Lytal at the same time.  Further, Lytal notes that while Lacoste *believed* that he "would have inspected" the hatch cover, he had no specific or independent memory of having done so.  Rec. Doc. 56-4, at 36.  As such, Lytal argues that Lacoste's testimony is based entirely on speculation as to what he ordinarily would have done as opposed to any specific recollection.  In fact, Lacoste himself admitted that if a hatch without a gasket and/or strongback were painted shut, the paint might seal the hatch in place, even to the point that if someone kicked the cover it would still hold.  Id.

Lytal likewise discredits the testimony of Wallace, which MBB also relies on heavily in support of its motion.  First, Lytal argues that Wallace testified merely that the manhole *cover* was in place, which no party disputes.  However, Lytal argues that Wallace never checked the tightness of the bolts, nor did he ever *open* the manhole covers to check for the presence of the strongback and gasket.  Further, while Wallace testified that he generally *kicks* the manhole covers to see of they are tight, Lacoste admitted that kicking would not reveal the presence of a gasket and strongback *if the manhole were painted shut*.  See Rec. Doc. 56-5, at 40.  Additionally, Wallace admitted that while he

9

usually visually inspects the manhole covers to determine if a gasket is in place, *this visual inspection is only effective if the cover is not completely painted over.* Id. at 21. Also, Wallace admitted that during the sea-trial he *did not open the rope locker hatch* to see if the gasket and strongback were properly installed. Id. at 22. Thus, while Wallace testified that he *believed* the components were in place, this was based solely on his kick-test and visual inspection of the cover, *not* on an actual opening of the cover. Finally, Wallace admitted that during all six occasions that he inspected the rope locker during construction, the hatch *was not yet in place*. Id. at 35-36. Further, he could not recall re-entering the locker after the hatches were installed, and never actually saw the strongback and gaskets in place, but nonetheless "believed" they were there based on his sea-trial observations. Id. at 37. However, Lytal argues that it is unclear how he can factually support such a belief when the manhole cover *had not yet been installed* during his initial inspections during construction, and *remained closed* after its installation.

Further, Lytal alleges that MBB has failed to respond to written discovery relevant to the issue of whether the strongback and gasket were actually installed. Specifically, Lytal has sought invoices for those components which have not yet been produced by MBB. Additionally, Lytal has requested dates for the

10

corporate deposition of MBB, but none have been provided.  Lytal argues that under Rule 56(f) of the Federal Rules of Civil Procedure, the Court should deny the present motion pending further discovery.  Likewise, Lytal cites cases in which courts have denied summary judgment based on a defendant's failure to respond to discovery, based on the premise that "[i]t should be fundamental that a defendant who has failed to answer relevant and timely interrogatories is, at least normally, in no position to obtain summary judgment."  Bane v. Spencer, 393 f.2d 108, 109 (1st Cir. 1968).

Finally, Lytal notes that the present motion should be denied based on MBB's failure to address Lytal's claims for contract defense and indemnity, as well as its claim that MBB failed to name Lytal as an additional insured as required by the ship-building contract.

Plaintiff has also filed an opposition to MBB's motion, which essentially tracks Lytal's opposition with respect to the issue of the absence of the gasket and strongback at the time of the accident.  However, Plaintiff also notes three additional and important facts.  First, Plaintiff points out that while MBB has presented Wallace and Lacoste as disinterested witnesses, they were in fact employed in a position of responsibility over the vessel, and thus to the extent that the gasket and strongback were not installed, they may be implicated in some way for that

failure. In other words, Plaintiff argues that Wallace and Lacost both have a personal interest in the issue of whether the ship was seaworthy at the time of embarkation, since it was their job to ensure that the vessel was fit for duty. Second, Plaintiff notes that the construction of the M/V Lytal was defective in other respects as well, including the fitting of improperly composed valves throughout the ship, which rusted and broke requiring repairs while at sea. Finally, Plaintiff notes that while MBB makes a point of the fact that Plaintiff did not sue MBB directly, this fact is a red herring for two reasons. First, the warranty of seaworthiness in maritime law is a non-delegable duty for which Lytal as the shipowner is solely liable. Second, when Lytal filed its third-party complaint against MBB, it tendered MBB as a direct defendant to Plaintiff pursuant to Rule 14(c). As such, Plaintiff argues that MBB's motion should be denied.

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material

facts in dispute to survive summary judgment. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588 (1986).

Based on material issues of material fact revealed in the briefing on the present motion, and in light of MBB's apparent failure to respond to Lytal's discovery requests relevant to the issues on which summary judgment is based, the Court finds that MBB's motion should be denied.

Most notably, while Wallace may have testified that the hatch *cover* was in place during the sea-trial, he also essentially admitted that he did not *actually open* the hatch to see if the gasket and strongback were actually in place at that time.[4] Furthermore, while MBB asserts that Wallace confirmed the presence of the strongback and gasket during his six inspections of the rope locker prior to the M/V Lytal Queen's sea-trials, Wallace admitted that the manhole covers were not even installed until *just before* the sea-trials, and further admitted that he never went into the rope locker to confirm their presence after the manhole cover was installed.[5]

Additionally, the entire question of whether the hatch cover was simply painted and sealed shut as opposed to properly fitted

---

[4] See Rec. Doc. 56-5, pp.21-22 & 31, in which Wallace describes how he kicked – but did not open and inspect – the single-bolt manhole covers as a means of testing the presence of the strongback and gasket.

[5] See Rec. Doc. 56-5, pp. 36-37.

13

with the gasket and strongback is itself an issue of fact precluding summary judgment. Finally, it is undisputed that at the time of Plaintiff's accident, *the gasket and strongback were not in place.* The only logical inference that flows from this undisputed fact, at least as the summary judgment record stands at present, is that the gasket and strongback were not installed at the time of delivery of the vessel by MBB. A court "evaluating a motion for summary judgment [must] resolve doubts in favor of the nonmoving party and make all reasonable inferences in favor of that party." Wooten v. Federal Exp. Corp., 2009 WL 928177, *2 (5th Cir. Apr. 7, 2009). In light of these and other issues of material fact that remain in dispute, summary judgment is improper and MBB's motion should be denied.

The Court notes that MBB has filed a reply brief in support of its motion for summary judgment in which it argues that Lytal's characterization of Lacoste's and Wallace's testimony is factually incorrect. Particularly, MBB contends that Lacoste specifically testified that he remembered seeing the strongback and gasket in place before delivery of the M/V Lytal Queen.[6]

---

[6] See Rec. Doc. 59-5, pp.27-28:

Q: Okay. When you inspected the cover and manhole assembly on the *M/V LYTAL QUEEN* after its installation and assembly by Master Boat Builders, did you specifically note that the strongback or latch that we talked about before was in place.

14

While Lacoste did so testify at his deposition in response to questions by counsel for MBB, when he was questioned by counsel for Lytal, Lacoste equivocated on his statement that the gasket and latch had actually been in place at delivery.[7] Likewise, MBB contends that Wallace also unequivocally stated that the gasket and strongback were in place at the time the M/V Lytal Queen was delivered to Lytal.[8] However, as with Lacoste's deposition

---

    A:    Yes.

    Q:    Okay. And when you specifically looked at the unibolt manhole assembly after the installation on the *M/VLYTAL QUEEN* by Master Boat Builders, did you specifically see that the watertight gasket was in place?

    A:    Yes.

[7] See Rec. Doc. 56-3, pp.36-37:

    Q.    I understand that you would have inspected it. But as we're sitting here today, do you specifically recall inspecting that hatch cover on the vessel?

    A.    No.

    Q.    Okay. So when you answered Counsel's question about the inspection, these were based upon what you ordinarily do while inspecting a vessel, correct?

    A.    Yes, yes.

[8] See Rec. Doc. 59-6, p. 38:

    Q:    Okay. And, as we sit here today, can you confmn that you have personal knowledge that when the *M/V LYTAL QUEEN* left Master Boat Builders the gasket

15

testimony, Wallace also hedged on the issue of whether and when he specifically and independently remembered seeing the strongback and gasket in place during his inspections.[9] As such,

---

       was in place on the focsle-deck, rope-locker hatch cover.

A:    I can say that on the - in my opinion, on the 18th of November on sea trial it was in place.

Q:    But can you confmn it was properly installed and in place on November 18th?

A:    Yes.

\*\*\*

A:    We saw - well one of the inspections is to do a final walk-through of the vessel. That would have been prior to sea trials. Sometime around the - probably a week before we would have entered the space. The manhole would have been open because of the requirements to ventilate. The strongback was in place, but it was open and the gasket was in place.

[9] See Rec. Doc. 56-5, pp. 18, 21-22:

Q.    Okay so did you personally verify the installation?

A.    What I did is I walked the vessel and ensured that all hatch covers were in place. I did not check to ensure that all the bolts were tight.

\*\*\*

Q.    And during your watertight integrity testing, did you confirm that the rope locker hatch cover was properly dogged down and that the gasket was in place under the hatch cover?

A.    What I did is - as I've told you before, I went around and basically stepped on, kicked all the manhole covers to ensure that they didn't move. That's the indication of whether they're - a gasket

16

the summary judgment record is not as cut and dried as MBB presents it, and summary judgment is inappropriate.

In addition, the Court finds that the issues presented in this case will turn in large part on the credibility of various witnesses in the case. In fact, Plaintiff has noted that Wallace and Lacoste may have self-serving interests in testifying that the gasket and strongback were properly installed. Likewise, as noted earlier, the equivocal deposition testimony of Lacoste and Wallace regarding the presence vel non of the gasket and

---

> is present and – or the strongback that holds it in place.
>
> Q. Okay. And, as we sit here today, can you confirm that you have personal knowledge that when the MV Lytal Queen left [Master] the gasket was in place on this fo'c'sle deck rope locker hatch cover?
>
> A. I can say that on the – in my opinion . . . it was in place.
>
> \*\*\*
>
> Q. Okay. And you did not check to make sure the gasket was there? You didn't open the manhole cover up to ensure the gasket was there or the locking mechanism –
>
> A. I did not..
>
> \*\*\*
>
> Q. Okay. But you did not go down into the rope locker and see whether that mechanism, the locking mechanism, or the gasket were in place, correct?
>
> A. Nope, did not.

strongback also implicate issues of credibility.  "In considering a motion for summary judgment, 'the court must draw all reasonable inferences in favor of the nonmovant and **may not make credibility determinations or weigh the evidence.**" <u>Gillaspy v. Dallas Independent School Dist.</u>, 278 Fed. Appx. 307, 311, 2008 WL 2037257, *3 (5th Cir. May 13, 2008) (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150-51 (2000)). Thus, due to the issues of credibility inherent in this case, summary judgment is improper.

Finally, MBB's alleged failure to respond to discovery requests for copies of invoices, which are *directly relevant* to whether the gasket and strongback were even purchased by MBB, is ground alone for denial of the present motion under Rule 56(f). Furthermore, MBB's refusal to submit to a corporate deposition ahead of its present motion also renders summary judgment improper on the same basis.  While MBB has indicated in its reply memorandum that it has fully complied with all discovery requests by filing supplemental responses on January 7, 2009 in accordance with an order of the Magistrate Judge, there is obviously a disconnect between the parties on these discovery issues, and summary judgment is inappropriate.

Finally, the issues of material fact discussed above also preclude summary judgment on Lytal's contract claims. Accordingly,

**IT IS ORDERED** that MBB's **Motion for Summary Judgment (Rec. Doc. 52)** is hereby **DENIED**.

New Orleans, Louisiana this 30th day of April, 2009.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE